**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-143 (APM)** |
| **v.** | : | |
| | : | |
| **MICHAEL DANIELE,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Michael Daniele to 11 months' incarceration, one year of supervised release, and $500 in restitution.

## I.      Introduction

Defendant Michael Daniele, a 61-year-old retired New Jersey state trooper, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Daniele was convicted at trial for violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by the defendant's: (1) presence on restricted Capitol grounds amidst signs, barricades, and police lines indicating his presence was not lawful; (2) decision to remain opposite multiple police lines despite his training and experience as a decades-long law enforcement officer; (3) decision to enter the Capitol building despite broken doors and windows, and the presence of a blaring alarm; and (4) false statements made to FBI and to this Court, which were contradicted by the government's evidence, including evidence from the defendant's own cellphone. Indeed, there is perhaps nothing more corrosive to the criminal justice system than lying.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for the defendant's actions alongside so many others, the riot would have failed. Here, the facts and circumstances of Daniele's crime and subsequent testimony support a sentence of 11 months' incarceration in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Complaint Statement of Facts, ECF 1-1 at ¶¶ 4-9.

### *Defendant Daniele's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Daniele traveled from Holmdel, New Jersey, to Washington, D.C. to attend the "Stop the Steal" rally.  Daniele left the rally before former President Donald Trump was

done speaking and made his way toward the Capitol.  Daniele, along with hundreds of other rioters, amassed at Peace Circle where barricades had been erected along the restricted perimeter.



*Image 1: Open-source photo showing Daniele (circled in red) at the Peace Circle (gov't trial exhibit 405)*

At approximately 12:53 p.m., rioters pushed through the first set of barricades at the Peace Circle and advanced up the walkway to the second set of barricades, which were manned by officers with the U.S. Capitol Police ("USCP").  "Area Closed" signs were affixed to the barricades that the USCP officers stood behind.  Daniele witnessed as multiple rioters picked up the barricades and shoved them into the officers.  The officers tried to re-establish the line, but rioters, including Daniele, continued to push forward, ultimately trampling the barricades and forcing the USCP officers to retreat to the West Plaza. As Daniele stepped on the barricades, and USCP officers began to retreat, Daniele picked up the USCP-issued hat of Officer Cruz, which had been knocked off during the melee with the rioters.



*Image 2: Open-source photo of Daniele (circled in red) as police retreat from the Peace Circle (gov't trial exhibit 409).*

Daniele and the other rioters advanced toward the West Plaza, further into restricted Capitol grounds, to yet another set of barricades.  Daniele approached a USCP officer and handed the officer the USCP-issued hat.  After Daniele returned the hat, rioters pulled away the bike barricades, leaving the officers exposed to the amassing rioters.  Daniele was at the barricades as they were being pulled away by rioters and put his hand on a barricade to move it behind him.



*Image 3: open-source still of Daniele (circled in red) handling the bike-rack barricades at the Lower West Terrace (gov't trial exhibit 308B at 00:04).*

Daniele remained on the west front of restricted Capitol grounds for over an hour.  During that time, he was directly opposite law enforcement officers trying to keep rioters at bay, including officers wearing full riot gear.  Videos introduced at trial show, at various points, Daniele yelling in the direction of the officers, and holding up his middle fingers at the officers.



*Image 4: Still from open-source video showing Daniele (circled in red) giving the middle finger to the line of police (gov't trial exhibit 315 at 00:01).*

Daniele ultimately made his way to the Upper West Terrace, and into the Capitol Building through the Senate Wing doors.  At the time he entered, the Senate Wing doors had been visibly broken by rioters, and the windows adjacent to the doors were shattered.  An alarm was also blaring from inside of the building.  Daniele entered the building at approximately 2:22 p.m.  As he walked through the entry hall, he stopped and held up his phone to take a picture of the broken windows adjacent to the Senate Wing door.



*Image 5: Still from CCTV showing Daniele (circled in red) inside the Capitol building recording the broken window with his cell phone (gov't trial exhibit 103)*

He continued further into the building, walking through the Crypt, where he had another rioter take a picture of him, before turning back and exiting through the Senate Wing doors at approximately 2:26 p.m. Daniele was inside the Capitol building for roughly six minutes.



*Image 6: Photo taken from Daniele's phone showing Daniele posing in the hallway between the Senate Wing Door and the Crypt (gov't trial exhibit 704).*

*Defendant's Post-Arrest Interview*

On February 23, 2021, Daniele gave a voluntary post-arrest interview to the FBI, which was recorded. Gov't Trial Ex. 502. During the interview, he admitted traveling to Washington, D.C. to attend the rally on January 6, 2021. He claimed that he thought the riot at the Capitol was a continuation of that rally. He falsely, and repeatedly, claimed that while on Capitol grounds he was "40 or 50 feet" from the action. *Id.* at 5:30-5:45. Significantly, open-source video depicts Daniele at the very front of the rioters on multiple occasions. *Supra* Images 1, 2, and 4. He acknowledged observing tear gas, and police attempting to hold back the crowd. *Id.* 5:45-6:00. He claimed that the Capitol building doors were "open" when he entered the building, which he later admitted at trial was misleading. *Id.* at 6:30-38. He also claimed that he only entered the Capitol building to try to rinse out his eyes, *id.* at 6:37-42, which this Court found unlikely, and which was belied by surveillance footage showing Daniele taking a picture of destruction of property immediately upon entering the building. Trial Ex. 103 at 00:24; Trial Tr. (6/14/2024) at 603:22-604:17 (noting that at no point during his time inside the Capitol building did Daniele appear to be in distress). He also told the FBI that the barricades were moved to the side when he arrived at Capitol grounds and that he never touched any barricades, Gov't Trial Ex. 502 at 18:45-19:15, which was also contradicted by the photos and videos of Daniele stepping on the barricades, picking up pieces of snow fencing, and handling the barricades at the Lower West Terrace.

During the FBI interview, Daniele refused to take full accountability for his actions. While he acknowledged that he probably should not have entered the Capitol building, he claimed that "the whole thing [January 6] was a set up," suggesting that other rioters who were goading the crowd on "looked like cops." Gov't Trial Ex. 502 at 28:10-35. He also blamed the violence of January 6 on the police—despite serving decades with law enforcement himself—accusing the police officers facing an unprecedented attack by a crowd of thousands of not following proper riot control practices. Daniele also claimed that "there wasn't a whole bunch [of violence] going on before [the police] started throwing flashbangs deep into the crowd," Gov't Trial Ex. 502 at 28:40-29:45, which is, again, contradicted by the videos and photos showing Daniele at the front of the violent mob that attacked police at the Peace Circle from the get go.

*Defendant's Testimony at Trial*

Further, Daniele provided false testimony to this Court during trial. For instance, as cited above, he testified that he entered the Capitol Building to flush out his eyes, Trial Tr. (6/13/2024) at 454:2, but surveillance footage shows that Daniele entered the building, demeanor appearing normal—not displaying any symptoms of loss of visibility—and immediately used his phone to take a picture of the damaged window adjacent to the Senate Wing Door. Gov't Trial Ex. 103 at 00:21. He also testified that he did not notice any damage to the door, despite walking past the broken Senate Wing door, and then stopping to take the picture of the broken windows. Trial Tr. (6/13/2024) at 493:5-494:24. He also testified that, when he was facing police officers on the West Plaza and flipping them off, he was actually flipping off "the establishment" and the "wasteful spending of money". *Id.* at 464:2-9. However, he also claimed that he did not know Congress was meeting at the Capitol on January 6th, *id.* at 469:24-4. All the more perplexing in light of his

testimony that he used a megaphone at the "Stop the Steal" rally to tell other rioters to go to the Capitol during Trump's Speech. *Id.* at 469:6-11.

During his testimony, Daniele suggested that he thought the riot at the Capitol on January 6 was just part of the Stop the Steal rally and claimed that, had he known violence would occur, he would have returned to the bus. Trial Tr. (6/13/2024) at 433:13-434:4). But on January 6th, Daniele was feet away from violence against police, and did not leave for several hours. Even if the Court credits his bizarre testimony that he remained on restricted grounds to return a baseball hat to a USCP officer, Daniele remained on the grounds and in the building for hours after. Daniele testified that it was his experience as a former state trooper that motivated him to return the hat. *See id.* at 438:18-439:6, *but see id.* at 486:22-487:2 ("Q: Now if you were a police officer who was stationed at the Capitol and you were having to retreat back to a second set of barricades because you saw hundreds of people who had just physically assaulted officers to gain access to the grounds, would you be thinking about where your hat was? A: If I was in that situation, no." Yet that same experience did not motivate him to leave the riot as soon as he saw the assaults on police at the Peace Circle.

## The Charges

On January 3, 2024, a grand jury indicted Daniele on a six-count Indictment for two violations of 18 U.S.C. 231(a)(3), and one violation each of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), 40 U.S.C. § 5104(e)(2)(G). On June 14, 2024, following a bench trial, Daniele was acquitted of the counts related to 18 U.S.C. § 231(a)(3) (Counts One and Two), and convicted of violating 18 U.S.C. § 1752(a)(1) (Count Three), 18 U.S.C. § 1752(a)(2) (Count Four), 40 U.S.C. § 5104(e)(2)(D) (Count Five), and 40 U.S.C. § 5104(e)(2)(G) (Count Six).

### III.      Statutory Penalties

Daniele now faces sentencing on Counts Three, Four, Five, and Six of the Indictment for violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), 40 U.S.C. § 5104(e)(2)(G), respectively. Counts Three and Four each carry a statutory maximum of one year of incarceration; Counts Five and Six each carry a statutory maximum of six months of incarceration.

### IV.      The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government disagrees with the Sentencing Guidelines calculation set forth in the Final Presence Report (ECF No. 62).

The Final PSR calculates the Sentencing Guidelines for Counts Three and Four as follows:

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Adjustment – Obstruction of Justice | +2 | U.S.S.G. § 3C1.1(a) |
| Adjustment – Zero Point Offender | -2 | U.S.S.G. § 4C1.1(a) |
| **Total** | **10** | |

*See* ECF No. 62 ¶¶ 38-45.

However, as described below, the government disagrees with §4C1.1's application. As a result, the Total Adjusted Offense Level should be **12**. The government's Sentencing Guidelines calculations are as follows:

**Count Three: 18 U.S.C. § 1752(a)(1) – Entering and Remaining in a Restricted Building or Grounds**

| Base Offense Level | 4 | U.S.S.G. § 2B2.3(a) (trespass) |
|---|---|---|
| Specific Offense Characteristic – Restricted Building or Grounds | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii) |
| Adjustment – Obstruction of Justice | +2 | U.S.S.G. § 3C1.1(a) |
| **Total** | **8** | |

**Count Four: 18 U.S.C. § 1752(a)(2) – Disorderly and Disruptive Behavior in a Restricted Building or Grounds**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) (Obstructing or Impeding Officers) |
|---|---|---|
| Adjustment – Obstruction of Justice | +2 | U.S.S.G. § 3C1.1(a) |
| **Total** | **12** | |

Here, Counts Three and Four group because both involve the same victim (Congress) and the same criminal act or transaction. *See* U.S.S.G. § 3D1.2(a). Because Count Four has a higher offense level, the offense level for the group is the offense level for Count Four, which is 12. *See id.* at 3D1.3(a). Accordingly, the total offense level is 12.

### *3C1.1's Application*

While the Court acquitted Daniele of Counts One and Two because it found that the government had not met its burden as to Daniele's intent, the Court should still apply the adjustment under U.S.S.G. § 3C1.1(a) given Daniele's false testimony. The burden of proof at trial is beyond a reasonable doubt; however, the burden of proof at sentencing as to the application of section 3C1.1 is lower: clear and convincing the evidence. *United States v. Montague*, 40 F.3d

1251, 1254 (D.C. Cir. 1994) ("We hold that the clear-and-convincing standard is the appropriate standard by which to evaluate defendant testimony for section 3C1.1 perjury enhancements."). Daniele's incredible testimony, as laid out in this memorandum, is contradicted by voluminous video and photo evidence showing his conduct on January 6th. *See infra* at 8-9. The government has proved his false testimony by clear and convincing evidence and the adjustment under section 3C1.1 should therefore apply.

### *4C1.1's Application*

Further, section 4C1.1 only provides for a two-level decrease for offenders who have zero criminal history points and meet certain additional criteria. In this case, the adjustment does not apply because Daniele was a member of the violent mob that infiltrated the Capitol on January 6th, and therefore "used violence of a credible threat of violence" in the commission of his crimes. U.S.S.G. §4C1.1(a)(3). Significantly, Daniele (1) was part of the mass of rioters that physically overcame police at Peace Circle, including trampling the barricades; and (2) paced up and down the front line on the West Front of the Capitol, yelling and making obscene gestures at the police while the police were surrounded by a visibly angry, violent mob. In such a situation, Daniele's behavior constituted a credible threat of force. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6 (defining a "credible threat of violence" as "a believable expression of an intention to use physical force to inflict harm."); *see also United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12 ("In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat

that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.").

Even if the Court does find that section 4C1.1 applies to Daniele, the Court should vary upward by two levels. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G

COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[2]

The U.S. Probation Office calculated Daniele's criminal history as a Category I. ECF No. 56 ¶ 48. Accordingly, the U.S. Probation Office calculated Daniele's total adjusted offense level at 10, and his corresponding Guidelines imprisonment range at 6-12 months. *Id.* ¶ 94. As noted above, the government believes that §4C1.1 does not apply, and so the total adjusted offense level should be 12, and Daniele's corresponding Guidelines' range 10-16 months.

---

[2] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

While the Court must consider the § 3553 factors to fashion a just and appropriate sentence, as discussed below, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Daniele's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors in this case, is that Daniele served for decades as a New Jersey State Trooper, who was trained in, amongst other things, riot and crowd control. Gov't Trial Ex. 502 at 28:40-29:00.  He knew, more than anyone, what the police were up against on January 6, 2021.  Despite that knowledge, he remained on restricted Capitol grounds, watched police get overrun by rioters, and ultimately entered the Capitol Building.

Daniele also entered the building through an "open" door with a broken window. Gov't Trial Ex. 103, 342A. Debris littered the floor. Gov't Trial Ex. 103. In fact, Daniele stopped to take a picture of the broken window upon his entry through the Senate Wing Door. *Id.* An alarm was also sounding continuously when he entered the building. Gov't Trial Ex. 342A. Moreover, Daniele entered despite watching and participating in the initial breach at Peace Circle, during which he saw law enforcement officers get assaulted.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of a significant period of incarceration.

### B. Daniele's History and Characteristics

As set forth in the PSR, Daniele has no criminal history. He served as a New Jersey state trooper from 2006 until 2013[3] and has been self-employed since 2010. Daniele has been compliant with his conditions of pre-trial release. However, his compliance should not justify a lower any sentence–Daniele's lack of criminal history has already been contemplated by the calculation of his Criminal History score and subsequent Guidelines calculation.

While Daniele's service with the New Jersey State Police is laudable, it renders his conduct on January 6 all the more troubling. As a former state trooper, Daniele was well aware of the pressure on police officers to secure a location and the dangers posed by a violent crowd during a riot. His voluntary decision to chase police officers as they fell back from their position is disturbing in light of his former police service and training. His repeated assertions that he only chased the police to return a baseball cap strains credulity when considering he witnessed violent attacks on police officers at the Peace Circle, and chose to remain on Capitol grounds for hours,

---

[3] During his testimony and FBI interview, Daniele stated that he worked as a New Jersey State Trooper for 26 years. The PSR states that he only worked as a state trooper from 2006 to 2013. Thus, there appears to be a factual mistake in the PSR.

even climbing through scaffolding to enter the very building that police officers fought to protect. Daniele's conduct and former police service demonstrates a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider, and it is especially important now, in another election year with very similar rhetoric that culminated in January 6, 2021 being spread in the lead up to the 2024 election.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. While Daniele stated that he is remorseful for his actions on January 6th, his apology falls flat in light of his false testimony and constant minimization.

Further, as addressed above, Daniele provided false testimony to the Court during trial. He falsely testified about his reason for entering the Capito building, Trial Tr. (6/13/2024) at 454:2; Gov't Trial Ex. 103 at 00:21. He also falsely claimed that he did not notice any damage to the broken Senate Wing door, despite taking a picture of the broken windows. Trial Tr. (6/13/2024) at 493:5-494:24. He also testified that, when he was facing police officers on the West Plaza and flipping them off, he was actually flipping off "the establishment" and the "wasteful spending of money". *Id.* at 464:2-9. During his testimony, Daniele suggested that he thought the riot at the Capitol on January 6 was just part of the Stop the Steal rally and claimed that, had he known violence would occur, he would have returned to the bus. Trial Tr. (6/13/2024) at 433:13-434:4). But on January 6th, Daniele was feet away from violence against police, and did not leave for several hours, despite his experience as a law enforcement officer.

Daniele not only lied to the Court, he also lied to the FBI during his post-arrest interview.

For example, Daniele told the FBI that the doors were open when he entered the building, and that the barricades were moved to the side when he arrived at Capitol grounds. Gov't Trial Ex. 502 at 6:30-38, 18:45-19:15. At trial, he admitted his statement to the FBI was misleading. Trial Tr. (6/13/2024) at 494:23-24.

The Court should view any remorse Daniele expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Daniele did not accept the results of the 2020 presidential election, so on January 6, he encouraged violence against police and invaded the Capitol. With the 2024 presidential election approaching, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Daniele in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors to assault on police officers.[4] This Court must sentence Daniele based on his own conduct and relevant

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Daniele was found guilty of Counts Three, Four, Five, and Six of the Indictment, charging him with Entering or Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Disorderly or Disruptive Conduct in a Restricted Building or Grounds in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in any of the Capitol Buildings in violation of 40 U.S.C. § 5104(e)(2)(G). Counts Three and Four are Class A misdemeanors. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Christie*, 21-cr-411 (APM), the defendant was found guilty of violating 18 U.S.C. §§ 1752(a)(1) and (2) and was sentenced to 11 months' incarceration. This Court specifically noted the defendant's lack of remorse in determining the sentence. Like Daniele, the defendant in *Christie* egged rioters on even after seeing fellow rioters assault police officers. Like Daniele, when the defendant in *Christie* saw the first set of bike rack barricades fall, he raced onto restricted grounds as police were overrun.

In *United States v. Anthony Vo*, 21-cr-00509 (TSC), the defendant was found guilty of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G) in connection with his entrance into the Capitol Building. Like Daniele, Vo passed fencing, clouds of tear gas, lines of police and riotous crowds before entering the Capitol building. Also, like Daniele, Vo took the opportunity to take pictures inside the Capitol building. Judge Chutkan sentenced the defendant to 9 months of incarceration after calculating the Offense Level to be 10, noting the defendant's lack of remorse.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI. Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Daniele was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[5]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf*. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic

---

[5] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

circumstances of each defendant.").

More specifically, the Court should require Daniele to pay $500 in restitution for his convictions on Counts 3, 4, 5, and 6. This amount fairly reflects Daniele's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $500 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

**VII.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 11 months' incarceration, one year of supervised release, $500 in restitution, and the mandatory assessments. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Daniele's liberty as a consequence of his behavior.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Carolyn Jackson*
Carolyn J. Jackson
Assistant United States Attorney
D.C. Bar No. 1644971
60 D Street N.W.
Washington, D.C. 20578
Carolyn.Jackson@usdoj.gov
(202) 252-7078

Sarah C. Martin
Assistant United States Attorney
Bar No. 1612989

</div>

555 Fourth Street, N.W.
Washington, DC  20530
Sarah.Martin@usdoj.gov
(202) 252-7048